MARK EDEN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Eden v. Commissioner
Docket Nos. 17484-80, 17485-80, 17486-80, 17487-80, 17488-80.
United States Tax Court
T.C. Memo 1987-101; 1987 Tax Ct. Memo LEXIS 97; 53 T.C.M. (CCH) 195; T.C.M. (RIA) 87101; February 19, 1987. *97 Ps' business involved developing and marketing devices for slimming and shaping the human body and operating health salons. Ps' advertising claims in relation to their businesses were the subject of lawsuits and investigations by various Federal and state agencies. During the years in issue petitioners Jack and Eileen operated their businesses from an office in Hayward, California, and from their residence in Pebble Beach, California that was owned and maintained at corporate expense. Jack and Eileen also had access to an Excalibur Roadster, also a corporate asset. During the years in issue Ps worked toward diversifying and expanding their businesses by developing nutritionally fortified foods. Their efforts eventually led to their marketing the Cambridge Diet. Held, corporate Ps did not accumulate their earnings and profits beyond the reasonable needs of their business, and therefore, are not liable for the accumulated earnings tax. Held further, the use of the Excalibur Roadster is not dividend income to Jack and Eileen. Held further, 80 percent of the use of the Pebble Beach property was for personal purposes. Therefore 80 percent of the deductions claimed by corporate P *98 Mark Eden in regard to that property are disallowed, and 80 percent of the fair rental value of the property, its furnishings, maintenance and improvements is dividend income to Jack and Eileen. Julian N. Stern and F. Jan Blaustein, for the petitioners. Rebecca T. Hill, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in income tax for the following petitioners for the following years: Taxable
Year
Petitioner
Docket No.
Ended
Deficiency
Mark Eden
17484-80
11/30/74
$311,164
11/30/75
142,791
Eileen Feather Studios of
Beverly Hills
17485-80
5/31/74
6,816
5/31/75
23,885
Eileen Feather Studios, Inc.
17486-80
12/31/74
5,670
12/31/75
1,365
Jack V. and Eileen M. Feather
17487-80
12/31/74
154,726
12/31/75
161,458
Eden Enterprises
17488-80
3/31/74
22,925
3/31/75
26,516
The issues for decision are: (1) whether petitioners' section 534(c) [2] statements shifted to respondent the burden of proof with respect to certain grounds asserted therein for the need to accumulate funds; (2) whether petitioner corporations accumulated earnings beyond the reasonably anticipated needs of their businesses; (3) whether corporate petitioners accumulated earnings to avoid tax with respect *99 to shareholders; (4) whether respondent properly disallowed to petitioner Mark Eden certain depreciation and investment credits; and (5) whether petitioners Jack and Eileen Feather received constructive dividends. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations and exhibits attached thereto are incorporated herein by reference. Background
Petitioners Jack and Eileen Feather (hereinafter referred to individually as Jack and Eileen) are individuals who are now and were, during the years in issue, husband and wife. They resided in Pebble Beach, California, at the time the petitions in these cases were filed. Vaughn and John Feather are sons of Jack and Eileen. Petitioners Mark Eden, Eden Enterprises, Eileen Feather of Beverly Hills (hereinafter referred to EFBH) and Eileen Feather Studios, Inc. (hereinafter referred to as EFS) are California corporations that had their principal place of business in California during the years in issue and at the time their *100 petitions were filed. Jack and Eileen owned 100 percent of the stock of Mark Eden, which in turn owned 100 percent of the stock of EFS and Eden Enterprises. EFS owned 100 percent of the stock of EFBH, which did business under the name of Beaumark Advertising. During the years in issue Jack, Eileen and Vaughn Feather were the sole directors of the corporate petitioners and were, respectively, their president, secretary-treasurer and vice president. Mark Eden was incorporated March 16, 1965, for the purpose of marketing by mail order the "Mark Eden Bust Developer." This product was manufactured by Mark Eden's subsidiary, Eden Enterprises. In 1965 Mark Eden formed Mark Eden, Ltd., an English corporation, for distribution of the Mark Eden Bust Developer to European markets. Mark Eden's capital stock is common stock, for which $2,500 was paid to the corporation. Additional capital contributions to paid-in surplus were made in 1966 ($10,000) and in 1967 ($15,000). During the years in issue, Mark Eden made loans to Jack and Eileen. These loans never totaled more than $6,269.10. Mark Eden did not pay dividends from 1965 through the years in issue. Mark Eden conducted its business by *101 placing advertisements in magazines soliciting mail orders for its products. In response to the advertisements, customers mailed orders to Mark Eden along with checks, money orders or cash payments. Mark Eden typed mailing labels and delivered the labels and orders to Eden Enterprises. Eden Enterprises then filled each order from its stock and mailed the product to the customer. Mark Eden's balance sheets at the end of its taxable years at issue were as follows: TAXABLE YEAR ENDED
Assets
11/30/74
11/30/75
Cash
$1,757,699
$1,944,922
Accounts receivable
5,139
5,695
Due from affiliates
395,808
395,297
Tax-exempt bonds
895,465
665,884
Prepaid taxes
0
105,277
Total current assets
$3,054,111
$3,117,075
Real estate deed of trust
0
273,129
Real estate
414,654
0
Building & other depreciable
assets (net of deprec.)
710,915
956,637
Investments in affiliates
128,831
129,775
Intangible assets (net of
amort.)
157
264
Total assets
$4,308,668
$4,476,880
Liabilities & Capital
Federal income tax
$323,171
$0
Due to affiliates
196,588
269,578
Total current liabilities
$ 519,759
$ 269,578
Note payable
1,502
1,050
Capital stock & paid in surplus
27,500
27,500
Retained earnings
3,759,907
4,178,752
Total liabilities & capital
$4,308,668
$4,476,880 Mark Eden's profit *102 and loss statements for its business during taxable years at issue were as follows: TAXABLE YEAR ENDED
11/30/74
11/30/75
Sales
$3,803,843
$3,532,991
Costs and expenses: Cost of goods sold
$548,781
$526,898 Officers' salaries
12,000
42,000 Depreciation
104,304
100,232 Advertising
1,311,897
1,557,396 Other expenses
519,572
670,238 Total costs
2,496,554
2,896,764
Income from operations
$1,307,289
$ 636,227
Other income: Taxable interest
$146,766
$126,141 Tax-exempt interest
43,337
68,255 Capital gains
(losses)
1,074
(116,781)
Non-deductible
capital loss
0
( 394)
Other income
140
1,000 Total other income
$ 191,317
$ 78,221
Income before Federal
income taxes
$1,498,606
$ 714,448
Less Federal income
taxes
684,171
294,723
Income after taxes
$ 814,435
$ 419,725
Eden Enterprises was incorporated in 1964 to manufacture products for related corporations. During the period from 1973 to 1975 Eden Enterprises loaned small amounts of money (under $2,000) to Jack and Eileen. Eden Enterprises did not pay dividends through the year 1980. Eden Enterprises' balance sheets at the end of its taxable years at issue were as follows: TAXABLE YEAR ENDED
Assets
3/31/74
3/31/75
Cash
$12,268
$ 5,958
Accounts receivable
236,756
319,292
Inventories
13,219
18,109
Prepaid taxes
2,600
8,000
Total current assets
$264,843
$351,359
Equipment, etc. (net
of depreciation)
40,041
37,080
Total assets
$304,884
$388,439
Liabilities & Capital
Accounts payable
$16,005
$13,446
Accrued wages
2,818
2,636
Accrued payroll taxes
749
660
Federal income taxes
payable
65,246
55,210
Total current
liabilities
$ 84,818
$ 71,952
Capital stock
20,000
20,000
Retained earnings
200,066
296,487
Total liabilities &
capital
$304,884
$388,439
The *103 accounts receivable shown above represent amounts due to Eden Enterprises from affiliated corporations. Eden Enterprises' profit and loss statements for its taxable years at issue were: TAXABLE YEAR ENDED
3/31/74
3/31/75
Sales
$414,264
$585,564
Cost of goods sold
139,616
204,806
Gross profit
$274,648
$380,758
Salaries and wages
$ 73,697
$ 79,437
Taxes
13,053
21,793
Depreciation
10,669
7,336
Other deductions
59,806
157,225
88,679
197,245
Income from operations
$117,423
$183,513
Other income
0
118
Gain on sale of assets
39,686
0
Income before Federal
income taxes
$157,109
$183,631
Less Federal income taxes
73,746
87,210
Income after taxes
$ 83,363
$ 96,421 EFS was organized on April 5, 1957. EFS was in the business of operating Eileen Feather Health Studios. After it discontinued this business in the mid-1960's, EFS derived its gross income from rental income and interest on investments. EFS paid no dividends through 1980. EFS's balance sheets at the end of its taxable years in question were as follows: TAXABLE YEAR ENDED
Assets
12/31/74
12/31/75
Cash
$ 95,835
$103,003
Marketable securities
91,995
129,013
Prepaid taxes
0
1,416
Investments
10,000
5,000
Buildings (net of depreciation)
409,272
389,393
Land
285,261
285,261
Other assets
20,172
17,779
Total assets
$912,535
$930,865
Liabilities & Capital
Due to affiliates
$250,753
$239,569
Federal income tax payable
6,289
0
Mortgages payable
276,396
253,814
Capital stock & paid in surplus
20,000
20,000
Retained earnings
359,097
417,482
Total liabilities & capital
$912,535
$930,865
The *104 investment account shown as an asset ($10,000 in 1974 and $5,000 in 1975) represents investments in two wholly-owned subsidiaries, Eileen Feather Home Course (EFHC) and EFBH. In 1975, EFHC was liquidated into EFS and its retained earnings of $45,526 were added to EFS's retained earnings. Before this liquidation, EFHC had been inactive, with its assets consisting exclusively of cash and tax-exempt securities. EFS's profit and loss statements for its taxable years at issue were: TAXABLE YEAR ENDED
12/31/74
12/31/75
Rental income
$ 98,750
$ 97,294 Taxable interest income
7,944
3,199 Tax-exempt interest income
3,735
8,156 Other income & capital gains
(losses)
1,559
(58)
Total income
$111,988
$108,591 Taxes
$ 29,690
$ 33,534 Interest
20,765
20,030 Depreciation
20,087
19,879 Other deductions
10,804
17,705 Total deductions
$ 81,346
$ 91,148 Income before Federal
income taxes
$ 30,642
$ 17,443 Less Federal income taxes
6,289
4,584 Income after taxes
$ 24,353
$ 12,859 EFBH was incorporated on August 3, 1964, to handle advertising for corporations owned directly or indirectly by Jack and Eileen. EFS received the standard 15 percent discount that magazines and other advertising media granted to advertising agencies. EFS charged *105 Mark Eden and the other affiliated corporations the full amount for advertising and retained the 15 percent discount as its fee for services rendered. EFBH also reported interest income. EFBH's balance sheets at the end of its taxable years at issue were as follows: TAXABLE YEAR ENDED
Assets
5/31/74
5/31/75
Cash
$46,574
$71,779
Due from affiliates
0
16,000
Certificates of deposit
495,443
0
Marketable securities
0
542,983
Total current assets
$542,017
$630,762
Note receivable
89,050
87,557
Depreciable assets (net
of depreciation)
1,147
1,752
Other assets
450
300
Total assets
$632,664
$720,371
Liabilities & Capital
Federal income tax payable
$ 36,641
$ 36,594
Due to affiliates
83,766
84,766
Capital stock
5,000
5,000
Retained earnings
507,257
594,011
Total liabilities & capital
$632,664
$720,371
The note receivable shown above includes a $88,550 loan to Vaughn Feather, the son of Jack and Eileen Feather. Vaughn Feather was the Vice President of EFBH, which paid him a salary of $23,028 in its 1974 taxable year and $28,528 in its 1975 taxable year. The note receivable balance shown as of May 31, 1975 was due entirely from Vaughn Feather. The marketable securities shown for the 1975 taxable year include a $500,000 investment in New *106 York Housing Authority Notes, which were tax-exempt securities. EFBH's profit and loss statements for its taxable years at issue were as follows: TAXABLE YEAR ENDED
5/31/74
5/31/75
Gross income
$841,818
$1,513,066
Less cost of
advertising space
710,313
1,277,220
Gross profit
$131,505
$235,846
Interest income
43,462
47,542
State tax refund
5,022
0
Total income
$179,989
$283,388
Officers' salaries
$ 77,028
$ 67,528
Other salaries
12,500
12,100
Taxes
4,364
14,602
Depreciation
10,032
480
Other deductions
13,637
22,830
Total deductions
$117,561
$117,540
Income before Federal
income taxes
$ 62,428
$165,848
Federal income taxes
37,641
79,094
Income after taxes
$ 24,787
$ 86,754
In addition to the salary to Vaughn Feather, EFBH paid salaries to Jack and Eileen Feather totaling $54,000 in its 1974 taxable year and $39,000 in its 1975 taxable year. EFBH paid no dividends at least through its taxable year ended March 31, 1980. The working capital needs for normal day-to-day operations of the corporate petitioners for their taxable years ended in 1974 and 1975 were as follows: Mark Eden
$1,185,000
EFBH
90,000
EFS
10,000
Eden Enterprises
75,000
Total
$1,360,000
The following are the retained earnings and current assets of other affiliated corporations owned *107 directly or indirectly by Jack and Eileen during the years in issue: Retained Earnings
Current Assets
Biophysical Research &
Development Corp. (BR&D)
$3,164,725
$2,020,948
Dream Wrap
23,709
60,993
EFS Walnut Creek
187,240
208,598
EFS San Jose
328,075
335,194
EFS Sacramento
268,105
273,105
Total
$3,971,854
$2,898,838
Jack and Eileen owned 100 percent of the stock of BR&D. BR&D was incorporated in December, 1969, to market a product called the Sauna Belt to be used for slimming the waist. It later developed and sold a product called Trim Jeans, inflatable shorts to be used for slimming the hips. BR&D sometimes used the name "Sauna Belt, Inc." or "Sauna Belt" in the conduct of its mail order business and in keeping its books and records. The corporation followed the same advertising and mail order format Mark Eden used in 1974 and 1975. BR&D purchased a house in Pebble Beach, California, in 1973. Dream Wrap, Inc. was a Nevada corporation engaged in the mail order sale of a body wrap to be used for slimming. Jack and Eileen owned 100 percent of its stock. Jack and Eileen established health salons under the name of "Eileen Feather Studios." There were approximately twelve salons in all, and a separate *108 corporation owned and operated each of the salons. Jack and Eileen owned 100 percent of the stock of each of these salons. In the early 1960's, the separate corporations were merged into three parent organizations, Eileen Feather Studios of Walnut Creek, Eileen Feather Studios of San Jose and Eileen Feather Studios of Sacramento, which have remained inactive since that time. Jack and Eileen developed other products to be used for slimming and shaping the human body, including Astro Jogger, Slim-Skins, Sauna Belt Waistline Reducer, Vacu-Pants, Vaccuum Pants, Hot Pants and Trim-Jeans. All these products were marketed through corporations owned directly or indirectly by Jack and Eileen. Expansion of the Business
In 1973 Mark Eden decided to diversify by expanding into the nutritional and diet food business. At first petitioners developed a number of nutritional products, such as protein-fortified cookies, doughnuts and coffee and a protein-fortified, low-calorie bread. Petitioners hired scientists and funded experiments to help them develop these products. Petitioners planned to develop a protein-fortified diet soft drink to be sold in supermarkets and other stores throughout the *109 country. After a number of experiments, petitioners found a way of producing a concentrated protein derived from whey. Petitioners estimated that they would need 10 to 12 million dollars to enter the nutrition business. The estimated budget included the cost of building a plant, maintaining an inventory and advertising. In 1976 petitioners found that they would need 12 million dollars to build a plant to produce the whey-protein. Mark Eden abandoned the idea of marketing the soft drink product, but its efforts in the field of nutrition eventually led to the marketing of the Cambridge Diet, a low-calorie powder to be mixed with water and used as a basis for a weight-loss diet. The Cambridge Diet was very successful; by the end of 1981 marketing the diet required several million dollars worth of inventory. By 1982 inventory requirements had increased, requiring an investment of 5 to 10 million dollars. In 1981 petitioners purchased a manufacturing facility for the Cambridge Diet for approximately 3 million dollars and spent additional sums to remodel it. This plant was never used, and was eventually sold. In 1975 Mark Eden developed an exercise device called the Astro Trimmer and *110 originally planned to sell it through sporting goods stores and drug stores rather than by mail order. Selling through retail stores requires a greater investment than selling by mail order because of the amount of inventory required to be sent to retail stores. After petitioners performed a test marketing of the Astro Trimmer in 1976, they decided to sell the product through mail orders. Litigation and Investigations by Government Agencies
The corporate petitioners have been involved in litigation initiated by state and Federal agencies, including the United States Postal Service (hereinafter referred to as the Postal Service) and the State of California Department of Public Health, Bureau of Food and Drug Inspection. Corporate petitioners have also been the subject of investigation by and requests for information from various government agencies, including the United States Food and Drug Administration (FDA), the Federal Trade Commission (FTC), the California Attorney General and various district attorneys in California, pursuant to their regulatory authority. Mark Eden first advertised its bust developers in national magazines in March, 1965. On April 21, 1965, the Postal Service *111 brought suit against Mark Eden alleging that the bust developer was ineffective and Mark Eden's advertising, therefore, was fraudulent. The Postal Hearing Examiner who presided at the trial held that the Postal Service failed to prove fraud. The Postal Service appealed this decision to its Judicial Officer who reversed the decision of the Hearing Examiner. Mark Eden then brought suit in the United States District Court for the Northern District of California and obtained a temporary restraining order preventing the Postal Service from interfering with its mail. As a result of this litigation, Mark Eden entered an agreement with the Postal Service permitting Mark Eden to continue to receive its mail as long as all of its incoming funds were placed in trust pending a final decision of the court. On January 30, 1967, while the temporary restraining order was in effect, Mark Eden and the Postal Service negotiated a settlement. The settlement agreement, entitled "Affidavit of Discontinuance" (hereinafter referred to as the Affidavit) allowed Mark Eden to continue to sell the bust developer, so long as future advertisements did not make certain claims. The Affidavit also provided that *112 the Postal Service would notify Mark Eden if it believed that Mark Eden had breached any of the advertising restrictions contained in the Affidavit and that Mark Eden could cure the alleged breach by revising the advertisement. Upon execution of the Affidavit, $400,000 that had been placed in trust was released to Mark Eden. For nearly one year after executing the Affidavit, Mark Eden sold its bust developers through advertisements identical to one that had been shown to a representatiave of the Postal Service. On December 12, 1967, the Postal Service commenced a proceeding against Mark Eden, charging that the same advertisement was in breach of the Affidavit. The Postal Service Judicial Officer ordered an impoundment of Mark Eden's mail, with delivery only on the condition that the incoming funds be placed in trust. On March 7, 1968, Mark Eden revised its advertisements and discontinued publication of the allegedly offending advertisement. On March 21, 1968, the Postal Service Hearing Examiner held that the advertisement was not in breach of the Affidavit. This decision was reversed by a Judicial Officer who issued a fraud order requiring that Mark Eden return all the funds that *113 had been or would be sent to Mark Eden as a result of the advertisement in issue to the customers with a statement that the advertisements had been discontinued and that orders were no longer being filled. Mark Eden filed suit in United States District Court praying for an injunction against the enforcement of the fraud order and for the return of the impounded funds. The district court issued a summary judgment in favor of Mark Eden and ordered that the impounded funds be transferred to Mark Eden. The Postal Service appealed this decision, and while the appeal was pending, the funds remained impounded. On November 7, 1970, more than five years after the first Postal Service proceeding had begun, the United States Court of Appeals for the Ninth Circuit affirmed the district court's decision, holding that the refund order was arbitrary and unwarranted by the Affidavit. Mark Eden v. Lee,433 F.2d 1077 (9th Cir. 1970). During this period of litigation with the Postal Service (1968-1970), the proceeds from certain advertisements were impounded and more than one million dollars was accumulated in a trust account as a potential refund to customers. The Ninth Circuit decision was not the *114 end of Mark Eden's litigation with the Postal Service. In 1979 the Postal Service initiated a criminal proceeding against several of Mark Eden's employees, including Jack Feather and Eileen Feather. The indictment in that case included 13 counts of mail fraud. By settlement agreement in 1983, the Postal Service dropped the criminal proceedings, and Mark Eden, Jack and Eileen agreed to stop manufacturing and selling the Mark Eden Bust Developer, the Mark II Bust Developer, the Astro Trimmer, the Astro-Jogger, the Sauna Belt Waistline Reducer, Slim-Skins, Vacu-Pants, Vaccuum Pants, Hot Pants, Trim Jeans, Dream Wrap or any other similar device. Mark Eden also agreed to pay the Postal Service $1,100,000. On June 10, 1980, the Postal Service began a proceeding against Eileen, Jack and Beaumark Advertising (which was the name under which EFBH did business with respect to a mail order advertisement for the Cambridge Diet). While this proceeding was pending, the government secured a temporary restraining order in the United States District Court for the Northern District of California prohibiting EFBH's sale of the Cambridge Diet. Shortly thereafter the parties entered into a settlement *115 agreement allowing Jack, Eileen and EFBH to continue to sell the Cambridge Diet as long as the advertisements for the diet met certain specifications. Later EFBH discontinued selling the Cambridge Diet by mail order and sold it instead through direct sales. On March 27, 1968, shortly after the Postal Service Hearing Examiner rendered his second decision in favor of Mark Eden, Arthur Cahn of the Postal Service's General Counsel's Office contacted the California Department of Public Health, Bureau of Food and Drug Inspections, informing the state agency that it need no longer withhold its state action against Mark Eden and assuring the agency of the Postal Service's cooperation in the matter. On March 28, 1968, the Bureau of Food and Drug Inspections served a Quarantine Notice against Mark Eden and against Eden Enterprises ordering that all bust developers be quarantined at the manufacturing plant and alleging that they had been falsely advertised and misbranded in violation of the California Pure Drugs Act. Mark Eden filed suit in California Superior Court praying for an injunction against enforcement of the Quarantine Notice. Judgment in that case was entered in favor of Mark Eden. *116 The FTC conducted two separate investigations of Mark Eden, one through its New York Regional Office and one through its Division of National Advertising of the Bureau of Consumer Protection. The investigation by the New York Regional Office began with a letter dated April 5, 1972, requesting Mark Eden to substantiate its advertising claims. Mark Eden responded to this request and later to another request in July, 1972, after which date the investigation by the New York Regional Office of the FTC was discontinued. On May 10, 1973, the Division of National Advertising of the Bureau of Comsumer Protection began the second FTC investigation by requesting information from Mark Eden about the bust developer, Mark Eden's corporate history, its sales, its advertising expenditures and copies of its advertisements, its refund policy and the "names, addresses, and statements of thousands of women" who had indicated that they were satisfied with the bust developer's performance. This investigation was officially closed on October 2, 1975. The FDA conducted annual inspections of the manufacturing facility where the bust developer was produced. Several of these inspections gave rise to further *117 inquiries by the FDA, two of which ripened into full investigations. One of these annual inspections was conducted on November 19, 1969. Two days later the FDA contacted Mark Eden's attorneys, requesting extensive information about the sales, inventory, advertising methods, interstate shipments and liability coverage of the corporate petitioners. By a Regulatory Letter dated May 5, 1977, the FDA claimed that, after inspecting Mark Eden's premises in May, June and November of 1976, it had concluded that Mark Eden was in violation of Federal law by making false claims about the bust developer's efficacy and failing to provide customers with pertinent information about the developer's use and function. The letter requested that Mark Eden correct the named violations within 10 days under threat of FDA regulatory sanctions, including seizure, injunction and prosecution. Mark Eden's attorneys met with FDA representatives to discuss the changes and on June 23, 1977, filed a written response to the FDA's Regulatory Letter. Neither Mark Eden nor its attorneys received any reply to this response. Mark Eden has also been the subject of state and local inquiries and investigations. On October *118 18, 1973, the Office of the Attorney General of the State of California, in connection with an investigation, addressed to Mark Eden a list of specific questions about the effectiveness of the bust developer and advertising claims with respect to it. After Jack responded to this letter on November 2, 1973, the investigation was dropped. On August 4, 1975, Mark Eden received a letter from the Office of the District Attorney of the County of Santa Clara reequesting specific information concerning the effectiveness of the bust developer and advertising claims made for it. After Jack responded on September 4, 1975, no further communication was received from that agency. On January 28, 1976, the Consumer Fraud Division of the District Attorney's Office of the County of Alameda, State of California, wrote to Mark Eden requesting information about the bust developer and advertisements for it. Once again, Jack responded, and the investigation was dropped. Other corporations owned by Jack and Eileen have been the subject of governmental investigations. In May, 1970, the Postal Service filed a complaint against BR&D, claiming that its Sauna Belt was ineffective and its advertising claims *119 were false. The challenge culminated in a Postal Service order on October 4, 1972, prohibiting BR&D from selling Sauna Belts. BR&D filed suit in the United States District Court for the Northern District of California to reverse the order and received judgment in its favor in January, 1974, almost four years later. BR&D has also been investigated by the FTC. The Excalibur Roadster
In 1974 representatives of Glamour magazine requested that Mark Eden make its advertisements more fashionable and less clinical. Mark Eden responded to this request by purchasing an Excalibur Roadster. Mark Eden took a series of photographs using the car and made one advertisement with it. Jack and Eileen never used the car for personal purposes. Jack drove the car on one occasion from Beverly Hills where it was purchased, to Pebble Beach. At the time of trial the odometer read approximately 3,900 miles. This mileage was attributable to the trip from Beverly Hills to Pebble Beach, a few business trips taken by petitioners' photographer and occasional trips of ten to fifteen miles by their gardner to keep it in working condition. The Pebble Beach Property
From 1963 through the years in issue, Jack *120 and Eileen did not own a home. The house at 11293 Kerrigan Drive, Oakland, California, where Jack and Eileen lived before they moved to Pebble Beach, was originally acquired in 1963 by one of the entities owned by Jack and Eileen. Title to the property was later transferred to Mark Eden. In August of 1973, BR&D purchased a house in Pebble Beach, California, for $475,000. Jack and Eileen moved their residence and Mark Eden and EFBH moved their business activities from Oakland to Pebble Beach on the ocean side of Seventeen Mile Drive in 1973. The Pebble Beach property had an unobstructed view of the ocean and had 19 rooms contained in 3 separate buildings. The first building was the gymnasium building, comprised of 2 rooms: a gymnasium and an office. The gymnasium was used for developing and testing Mark Eden's products. The second building was the main house, a two-story building containing a courtyard surrounded by 11 rooms: a living room, kitchen, recording studio, camera room, office for Eileen, 4 bedrooms, and a master bedroom and dressing area. The living room was a large, impressive room that overlooked the Pacific Ocean. It was lined with books and was furnished with *121 antiques. The dining room also overlooked the ocean. The third building contained a garage and 6 rooms: 4 offices, a photography laboratory and a storage room. Jack and Eileen began operating their business from their home in 1964 when they established an advertising office in their home and kept advertising assistants there on a permanent basis. During 1974 and 1975, Mark Eden conducted its business both in Pebble Beach and in Hayward, California. It used the Pebble Beach property for developing new products and testing them, writing and designing its advertisements, bookkeeping, meeting with advertisers, and it used the Hayward facility for sorting mail orders and typing labels. There are no written leases regarding the Pebble Beach property. Mark Eden paid the insurance, all utilities and telephone, gardening and the real property taxes on the Pebble Beach property during the years in issue. The amounts spent on insurance, utilities and gardening totaled $15,800 for each of the years in issue. During the years 1974 and 1975, Mark Eden spent $349,153 and $305,564, respectively, for improvements and furnishings for the Pebble Beach property. In 1974 this amount included over *122 $10,000 for architectural services, over $20,000 for carpeting, over $5,000 for chandeliers, over $20,000 for draperies, over $10,000 for painting, and several thousand dollars for furniture and upholstery. In 1975 Mark Eden's Pebble Beach investment account included such items as a color television, $4,446 worth of books of poetry and novels, $1,375 for painting the oak doors in the billiard room and $1,668 for painting the music room. Jack and Eileen's son John was 10 or 11 years old in 1974 and 1975. Sometimes children would come to the Pebble Beach house to play with him. Jack and Eileen's son Vaughn was married in 1976. The wedding and reception were held at the Pebble Beach house. Mark Eden owned the following tranportation vehicles during the 1974 and 1975 taxable years: (1) a 1968 Rolls Royce, (2) a 1966 Mercedes, (3) a 1973 Lincoln, (4) a 1974 Oldsmobile, (5) a 1972 Porsche, (6) a 1974 LTD Ford Station Wagon, (7) a 1974 Excalibur Roadster, and (8) a Cessna airplane. Neither Jack nor Eileen individually owned any transportation vehicles in 1974 or 1975. In their 1974 and 1975 Federal income tax returns, Jack and Eileen reported additional compensation income of $10,200 *123 each year for personal use of company assets. They also reported each year $96,000 of salary income from corporations that they owned directly or indirectly. OPINION Accumulated Earnings Tax
Respondent determined deficiencies in corporate petitioners' income tax for the taxable years 1974 and 1975 under section 531 [3] in that corporate petitioners were availed of for the purpose of avoiding the income tax of shareholders by permitting their earnings and profits to be accumulated instead of being distributed as a dividend. [4] *125 Under the statutory provisions dealing with the accumulated earnings tax, unless petitioners can prove to the contrary by a preponderance of the evidence, the very fact that corporate petitioners' earnings and profits were permitted to accumulate beyond the reasonable needs of their business is determinative of the proscribed purpose. Section 533(a). However, to the extent corporate petitioners can establish that they retained all or any part of their earnings and profits to meet the reasonable needs of their businesses, such amount will be allowed as a credit against their accumulated taxable income, which is subject to the accumulated earnings tax. Section 535. *124 Accordingly, it is necessary to consider whether corporate petitioners' earnings and profits were, during the years in issue, accumulated beyond the reasonable needs of their businesses. We must also determine to what extent the earnings and profits were accumulated for the reasonable needs of the businesses so as to give proper consideration to the credit. Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566 (1965); John P. Scripps Newspapers v. Commissioner,44 T.C. 453 (1965). Whether a corporation has permitted its earnings and profits to accumulate beyond its reasonable business needs and whether it was availed of for the purpose of avoiding the income tax with respect to shareholders are both questions of fact. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Bremerton Sun Publishing Co. v. Commisssioner,supra. Pursuant to section 537, the term "reasonable needs of the business" includes reasonably anticipated needs of the business. In defense of their accumulations, petitioners contend that the accumulated funds were necessary to provide for working capital, potential lawsuits and development of new product lines. The parties have stipulated that the working capital needs of the corporate petitioners for 1974 and 1975 totaled $1,360,000. Respondent's position is that petitioners' fear of potential lawsuits was unreasonable and that petitioners' development of new product lines did not require nearly the amounts accumulated allegedly *126 for that purpose. As a preliminary matter, petitioners maintain that the burden of proof has been shifted under the provisions of section 534. Respondent sent petitioners notifications pursuant to section 534(b) and petitioners now contend that their timely statements in reply thereto complied with section 534(c), thereby shifting the burden of proving the accumulations to be beyond the petitioners' reasonable needs. The burden of proof to show that the purpose of the accumulations was not to avoid income tax with respect to shareholders is on petitioners. American Metal Products Corp. v. Commissisoner,34 T.C. 89 (1960), affd. 287 F.2d 860 (8th Cir. 1961); Pelton Steel Casting Co. v. Commissioner,28 T.C. 153 (1957), affd. 251 F.2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958). However, the burden of proof to show that the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business shifts to respondent if the taxpayer has submitted a sufficiently detailed statement setting forth the grounds, together with facts sufficient to show the basis thereof, on which the taxpayer relies to establish that earnings and profits were not permitted *127 to accumulate beyond the reasonable needs of their business. Section 534(c). Petitioners' section 534(c) statement can result in partially shifting the burden of proof to the respondent only if (1) it shows grounds which actually are sufficient to justify the accumulation of earnings as not being in excess of the reasonable needs of their businesses, and (2) it contains facts that are sufficient to support those grounds. I.A. Dress Co. v. Commissioner,32 T.C. 93, 100 (1959), affd. 273 F.2d 543 (2d Cir. 1960). To shift the burden of proof to the respondent, the section 534(c) statement must constitute more than mere notice of an intent to prove the reasonableness of the accumulation. Rather, the taxpayer must show its hand by stating with clarity and specificity the grounds on which it will rely to prove reasonable business needs, and by setting out the facts (not the evidence, but more than conclusions of law) that, if proven, support the alleged business needs for the accumulation. Rutter v. Commissioner,81 T.C. 937, 939 (1983), quoting B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.08, at 8-33 (4th ed. 1979); fn. ref. omitted. Respondent *128 contends that corporate petitioners' section 534(c) statement did not set forth facts in sufficient detail to support their grounds for proving reasonable business needs. After examining and studying the statement submitted by petitioners and respondent's arguments in his brief concerning the claimed insufficiency of the statement, we have concluded that the statement does set forth sufficient facts to establish the grounds upon which petitioners relied. Accordingly, the burden of proof to show that corporate petitioners' earnings and profits were permitted to accumulate beyond their reasonable business needs is placed on respondent. Turning now to the facts, we find that, regardless of the placement of the burden of proof, petitioners did not accumulate their earnings and profits beyond the reasonable needs of their businesses. Petitioners' section 534(c) statement lists as the first ground for accumulating earnings and profits the need for working capital. The parties have stipulated, and we so find, that the working capital needs for normal day-to-day operations of the corporate petitioners for the taxable years 1974 and 1975 totaled $1,360,000. The second ground listed in petitioners' *129 section 534(c) statement was to provide for contingent liabilities. It is well established that a corporation can accumulate funds to satisfy a contingent liability. Casey v. Commissioner,267 F.2d 26 (2d Cir. 1959), affg. T.C. Memo. 1957-226; William C. Atwater & Co. v. Commissioner,10 T.C. 218 (1948). Petitioners' statement sets forth in detail and the record is replete with evidence of the history of litigation between petitioners and various Federal, state and local regulatory and law enforcement agencies and investigations by those agencies. Petitioners maintain that they needed to retain all their corporate earnings to provide for attorneys fees, litigation costs and refunds to customers and class action suits that might result from potential litigation with these government agencies. Respondent argues that petitioners' fears of future litigation were unfounded and that the only real risk of loss to petitioners from potential litigation amounted to no more than $100,000 to $300,000 for attorneys fees and litigation costs. Respondent contends that the Affidavit insulated petitioners from further attacks by government agencies. The Affidavit, however, was an agreement between *130 Mark Eden and the Postal Service; it had no binding effect on other government agencies, nor did it preclude the Postal Service from attacking petitioners. The Affidavit merely established a procedure whereby petitioners would be notified of any advertising objectionable to the Postal Service and would be provided an opportunity to revise such advertising before the matter could be brought to trial. The Affidavit permitted petitioners' funds to be impounded pending a hearing on an alleged breach of the terms of the Affidavit. Moreover, the record in this case establishes that the Affidavit in fact did not insulate petitioners from attacks by the Postal Service. In 1967 the Postal Service commenced a proceeding against Mark Eden, charging that an advertisement that had previously been submitted to the Postal Service was in breach of the Affidavit, causing Mark Eden's funds to be impounded for more than two years until the Ninth Circuit affirmed a district court order to return the impounded funds. Respondent also maintains that during the years in issue, the Postal Service felt itself estopped from proceeding against Mark Eden and lacked the funds to so proceed. The record does *131 not support this assertion. In 1968 Congress amended the mail fraud statute, 39 U.S.C. sec. 4005(a) (1968), to eliminate the need to prove intent to deceive. H. Rept. No. 235, 90th Cong., 2d Sess. (1968), reprinted in 3 U.S. Code Cong. & Ad. News 4290, 4297 (1968). Because the Affidavit was executed under the older law, Mark Eden's management and attorneys feared that the Affidavit was no longer binding on the Postal Service. In 1979 the Postal Service confirmed these fears in a letter to Mark Eden's attorney stating that "the repeal of 39 U.S.C. section 4005 (1964) renders inappropriate any attempt to enforce the Affidavit of Discontinuance, for the current statute materially differs from its predecessor, which required proof of intent to deceive." Subsequent events also prove the reasonableness of the accumulation in this case. Pursuant to an investigation brought in 1978, the Postal Service initiated criminal proceedings against Mark Eden, involving a criminal indictment that alleged charges based on petitioners' behavior as early as 1964 and including the years in issue. The settlement of this case required petitioners to cease manufacturing and selling their exercise devices *132 and to pay the Postal Service $1,100,000. During the years in issue, petitioners had reason to fear that the investigations by other government agencies would lead to litigation. In 1972 petitioners' attorney met with attorneys from the FTC to discuss a possible consent decree following an investigation by that agency. Petitioners' attorney warned them that a lawsuit with the FTC posed a serious risk that petitioners would be required to make refunds to customers and that adverse findings might lead to a class action suit against petitioners. Petitioners did not know that the FTC had discontinued its investigation until October, 1975. A refund order would have required petitioners to reimburse their customers as much as $3,803,843 and $3,532,991, the amounts received for sales in the taxable years 1974 and 1975, respectively. Petitioners also feared that investigations by the FDA could also lead to litigation. These fears were confirmed in 1977 when the FDA sent a Regulatory Letter threatening them with "seizure, injunction, and prosecution." Finally, petitioners had reason to fear that investigations and inquiries by various state and local agencies during the mid-1970's might *133 lead to litigation. Investigations by the California Department of Public Health, Bureau of Food and Drug Inspections had led to the issuance of a Quarantine Notice by that agency against Mark Eden and Eden Enterprises. In 1968 Mark Eden was forced to go to state court to enjoin the enforcement of the Quarantine Notice. We are satisfied that the possibility of liability arising from litigation was a realistically foreseeable contingency and treated as such by petitioners. Taking into account the amount of petitioners' net current assets during the years in issue and petitioners' current working capital needs, the accumulations were not excessive in light of the potential liability. Petitioners listed as their third ground for the accumulation of earnings and profits during the years in issue the development of a new product line. See section 1.537-2(b)(1), Income Tax Regs. (providing that bona fide expansion of business may indicate that earnings and profits of a corporation are being accumulated for the reasonable needs of the business); section 1.537-3(a), Income Tax Regs. (the business of a corporation is not merely that which it has previously carried on but includes any line *134 of business which it may undertake). As we stated in John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 468 (1965): We have stated before that what the reasonable needs of a business are is, at first instance, a question for the officers and directors of the corporation * * * A corporation can finance its growth by various means. One such method is the retention of its earnings and profits until such time as it is ready to expand * * * Courts should be hesitant to substitute their judgment and attribute a tax-avoidance motive unless the facts and circumstances clearly warrant the conclusion that the accumulation of earnings and profits was unreasonable and for the proscribed purpose * * * (Citations omitted.) The record traces the steps that petitioners took to diversity their business by developing a new product line of nutritionally fortified junk foods. Petitioners' efforts during the years in issue ultimately led to the development and marketing of a highly successful product, the Cambridge Diet. During the years in issue petitioners reasonably anticipated that the expansion into the nutritional products business would require at least 10 to 12 million dollars to cover *135 the costs of a manufacturing facility, inventory and advertising. In their section 534(c) statement petitioners asserted that they would need reserves of 5 million dollars to develop their nutritional products business. In light of subsequent events, this estimate was not far from the mark. In 1982 the costs of marketing the Cambridge Diet required an investment of at least five million dollars for inventory alone. Respondent maintains that petitioners' plans for expansion into the nutritional products business were not sufficiently "specific, definite and feasible" to justify accumulations of five million dollars under section 1.537-1(b), Income Tax Regs. We realize that Jack, Eileen and Vaughn Feather acted in a rather informal manner as directors of corporate petitioners and that their plans for expansion might not be as specific as desired nor were all their plans reduced to writing and contained in formal minutes. However, we have held that a closely held corporation cannot be held to the same strict formalities of large public corporations. See, e.g., John P. Scripps Newspapers v. Commissioner,supra.We are of the opinion that petitioners were justified upon the facts in *136 this case in retaining five million dollars during the years in issue for future expansion. We therefore see no reason to discuss the other grounds listed in petitioners' section 534(c) statement in justification of their retention of earnings and profits during the years in issue. Accordingly, we hold that petitioners did not accumulate earnings and profits during the years in issue beyond the reasonable needs of their businesses. Having so held, we need not consider whether the proscribed purpose of avoiding income tax may have existed. The credit provided in section 535(c)(1) renders such consideration unnecessary. See John P. Scripps Newspapers v. Commissioner,supra.
Respondent argues that loans to Eileen, Jack and Vaughn Feather, certain intercorporate transactions, use of the Pebble Beach house by Jack and Eileen at the expense of BR&D and Mark Eden, and the use by Jack and Eileen of automobiles owned by Mark Eden are indicia that the accumulations of earnings and profits in this case were unreasonable. Because we have found that the primary purposes of the accumulations in this case were to provide for working capital, contingent liabilities, and the expansion of the business *137 and that the accumulated funds did not exceed these needs, petitioners have prevailed on this issue. Under the facts and circumstances of this case, we are not convinced that either the loans or the availability to Jack and Eileen of certain benefits at corporate expense require a holding that the accumulations during the years in issue were for the proscribed purpose. Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566 (1965). Petitioners' Use of Corporate Assets
On its income tax returns for the years in issue, Mark Eden deducted its expenditures for the Pebble Beach property and the Excalibur Roadster under section 162 which provides a deduction for "ordinary and necessary" business expenses and section 167 which provides a depreciation deduction with respect to "property used in the trade or business." The initial question to be considered, under either section, is whether the ownership and maintenance of the property related primarily to personal or to business purposes. If the acquisition and maintenance of the property is primarily for business purposes, the deductions will be allowed; if for personal purposes, the deductions will be denied. International Artists, Ltd. v. Commissioner,55 T.C. 94 (1970). *138 Disallowance of predominately personal expenditures is expressly mandated by section 262. Where there are both significant and substantial business and personal motives, however, an allocation must be made by comparing the amount of time or space devoted to business use with total use. International Artists, Ltd. v. Commissioner,supra. Respondent has allocated 20 percent of the usage of the Pebble Beach property to business purposes. It is respondent's position that none of the use of the Excalibur Roadster was attributable to business purposes. Accordingly, respondent disallowed 80 percent of the utilities, gardening and insurance expenses claimed by Mark Eden with respect to the Pebble Beach house in which the Feather family lived during the years in issue. Respondent also disallowed for both years 80 percent of the depreciation claimed with respect to the furnishings and improvements to the house (exclusive of the gymnasium); 80 percent of the investment tax credit claimed with respect to the furnishings and all the investment tax credit claimed with respect to the Excalibur Roadster. Respondent also contends that the personal use of the Pebble Beach property and the Excalibur *139 Roadster was taxable to Jack and Eileen as constructive dividends. In the notice of deficiency sent to Jack and Eileen, respondent added as dividend income in 1974 the cost of the Excalibur Roadster, 80 percent of the expenditures by Mark Eden for the Pebble Beach property and 80 percent of the fair rental value of the Pebble Beach house. For 1975 respondent added as dividend income 80 percent of the expenditures by Mark Eden for the Pebble Beach property and 80 percent of the fair rental value of the Pebble Beach house. Petitioners have acknowledged that at least two bedrooms and one bathroom of the house were used exclusively for personal purposes. They reported additional compensation income of $10,200 each year for personal use of company assets in their 1974 and 1975 income tax returns. In the notice of deficiency for those years, respondent deducted the $10,200 already reported as income each year. It is well established that the controlling shareholders' receipt of property from their corporation or their personal use of corporate assets without payment of fair value is taxable to them as a dividend. Sparks Nugget, Inc. v. Commissioner,458 F.2d 631 (9th Cir. 1972); Greenspon v. Commissioner,23 T.C. 138 (1954), *140 affd. 229 F.2d 947 (8th Cir. 1956). Transfers from one corporation to another under common ownership are dividends to the common owner if they are made for shareholder benefit rather than primarily for the corporate benefit of the transferor corporation. Sparks Nugget, Inc. v. Commissioner,supra.Where a shareholder's use of corporate assets serves both a personal and a business purpose, an allocation must be made and the percentage of use that is attributable to personal benefit is taxable to the shareholder as a dividend. International Artists, Ltd. v. Commissioner,supra.
The parties agree that the Pebble Beach property served a dual purpose, that some of its use was for personal and some for business purposes. They disagree, however, on the allocation of the usage. Petitioners also maintain that the entire use of the Excalibur Roadster was for business purposes. Petitioners bear the burden of proving that respondent's allocation of business and personal usage was incorrect with respect to the deductions, the investment tax credits and the constructive dividends. Rule 142(a). In this case petitioners have met their burden of proving that the use of the Excalibur Roadster was *141 for business purposes. They have failed, however, to meet their burden in proving that respondent's allocation was incorrect with respect to the Pebble Beach property. Mark Eden was entitled to the full investment tax credit it claimed on its return for the taxable year 1974 for the purchase of an Excalibur Roadster. Petitioners have established by a preponderance of the evidence that Mark Eden bought the car to use in its advertising logo to improve its image and that any personal use of the car by the Feathers was purely incidental. Jack drove the car only once, to transport it from Beverly Hills where it was purchased to Pebble Beach; Eileen never drove it. The total mileage on the Excalibur Roadster's odometer from the date of its purchase in 1974 until the date of the trial in this case was 3,900 miles, attributable to the trip from Beverly Hills to Pebble Beach, a few business trips made by petitioners' photographer and occasional short trips to keep the car in working condition. Accordingly, the investment tax credit claimed with respect to the Excalibur Roadster will be allowed, and none of the use of the car is attributable to Jack and Eileen as dividend income. [5] *142 Petitioners maintain that the primary use of the Pebble Beach property during the years in issue was for business purposes. They argue that their business was operated primarily from the Pebble Beach location, that the maintenance of a sumptuous and lavishly furnished house was necessary to attract the better *143 magazines to advertise their products and that of the 19 rooms located on the premises, only two bedrooms and a bathroom were devoted to personal purposes. Petitioners contend that only ten percent of the use of the Pebble Beach property was personal. We do not doubt that the house at Pebble Beach served some business purposes. Petitioners have established that it was used to entertain publishers and to house employees visiting for business purposes. Some of the rooms were designated as offices and some were used for business conferences and meetings, advertising layout, photography and bookkeeping. Nevertheless, the entire house remained at all times accessible to Jack and Eileen. There was no separate entrance or partition separating the bedrooms and bathroom from the rooms allegedly used for business purposes only. No restrictions were placed on Jack and Eileen's use of the entire premises. In fact, petitioners admitted to some use of the premises for social entertaining. The Pebble Beach house was the exclusive residence of Jack and Eileen during the years in issue. They had the full enjoyment of the facilities at Pebble Beach, including the many elaborately furnished rooms, *144 the spacious courtyard, and the unobstructed views of the Pacific Ocean. Petitioners have not challenged respondent's determinations of the amounts expended by Mark Eden and BR&D for the house, improvements and furnishings, nor do they challenge respondent's determination of the fair rental value of the house, improvements and furnishings as a whole. Accordingly, 80 percent of the deductions and investment credits claimed with respect to the Pebble Beach property is disallowed and the benefit received from the use of the Pebble Beach property and its furnishings as determined by respondent is dividend income to Jack and Eileen. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Eileen Feather Studios of Beverly Hills, docket No. 17485-80; Eileen Feather Studios, Inc., docket No. 17486-80; Jack V. and Eileen M. Feather, docket No. 17487-80; Eden Enterprises, docket No. 17488-80.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of -- (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100,000. ↩
4. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. -- The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.
5. Respondent has apparently conceded the Excalibur Roadster issue by admitting that "there is little, if any, evidence to contradict petitioners [sic] evidence regarding the exclusive business use of the Excalibur Roadster." Respondent adds, however: It appears that respondent may have picked the wrong luxury car to assert as a dividend to the Feathers. The Feathers owned no cars individually, while Mark Eden owned several cars including a Rolls Royce and a Mercedes Benz. Respondent may not include the use of the Rolls Royce and the Mercedes Benz as dividend income to Jack and Eileen. It is a new matter, raised for the first time in respondent's reply brief. To permit respondent to raise a new issue regarding the use of the Rolls Royce or the Mercedes Benz at this late date would prejudice petitioners. Accordingly, we will not consider this issue. Leahy v. Commissioner,87 T.C. 56↩ (1986).