T.C. Summary Opinion 2004-8

UNITED STATES TAX COURT

WILLIAM J. CUTTS, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

AMERICAN TANK & VESSEL, INC., Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10471-01S, 10472-01S.   Filed January 29, 2004.

Irvin Grodsky, for petitioners.

Linda J. Wise, for respondent.

BEGHE, Judge:  These consolidated cases were heard pursuant to section 7463 of the Internal Revenue Code in effect when the petitions were filed.[1]  The decisions to be entered are

_____

[1]Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined the following deficiencies and penalties with respect to petitioners William J. Cutts (Mr. Cutts) and American Tank & Vessel Inc. (ATV):

| Petitioner | TYE | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|---|---|---|---|
| Mr. Cutts | 12/31/97 | $9,838 | $1,968 |
| ATV | 9/30/97 | 4,508 | 902 |

For convenience, we refer to the tax years collectively as petitioners' 1997 tax year or the 1997 year.

After giving effect to a partial concession by respondent,[2] the issues remaining for decision are:

1. Whether ATV or Mr. Cutts is entitled to deductions for expenses with respect to land and buildings known as Landmark Hall in excess of the amounts allowed in the notices of deficiency, and whether Mr. Cutts received constructive dividends for Landmark Hall expenses disallowed to ATV. We hold ATV is entitled to deduct rent and utility expenses, but not pool repair expenses, for Landmark Hall in excess of those allowed in the notice of deficiency. We hold Mr. Cutts received constructive dividends for Landmark Hall utility expenses disallowed to ATV.

---

[2]Respondent concedes petitioners are not liable for the sec. 6662(a) penalty for any part of the deficiencies attributable to adjustments for the use of Landmark Hall.

We hold Mr. Cutts is entitled to deduct amounts paid for insurance, mortgage interest, real estate taxes, and depreciation as rental expenses for Landmark Hall in excess of those allowed in the notice of deficiency, with correlative reductions in itemized deductions allowed for mortgage interest and real estate taxes in amounts to be determined in a Rule 155 computation.

2. Whether petitioners are entitled to net debts from Mr. Cutts to ATV against debts from ATV to Mr. Cutts for purposes of computing imputed income under section 7872. We hold petitioners are entitled to net the debts and thereby fix the respective amounts of dividend and interest income constructively realized by Mr. Cutts and ATV under section 7872 in smaller amounts than respondent determined.

3. Whether petitioners are liable for the accuracy-related penalties under section 6662. We hold petitioners are liable for the penalties on the portions of the deficiencies attributable to section 7872.

Background

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. When the petitions were filed in these cases, Landmark Hall, located at 1005 Government Street, Mobile, Alabama, served as Mr. Cutts's residence and ATV's principal place of business.

On March 19, 1982, ATV was incorporated in Alabama.  ATV fabricates steel plates into storage and processing tanks, including pressure vessels, distillation columns, paper mill digesters, and wind tunnels.

Mr. Cutts founded ATV and has served as its president from its inception.  On ATV's 1997 return, Mr. Cutts was listed as an officer who owns 45 percent of ATV's common stock.

ATV's business is substantial:  It uses the completed-contract method of accounting; for its fiscal year in issue, it reported gross sales in excess of $33 million and yearend retained earnings in excess of $2 million.  Mr. Cutts, for his tax year in issue, received salary of $187,369 from ATV and net rental income of $66,823 from ATV and three rental houses.

During the 1997 year, ATV's general office, sales office, and drafting and engineering activities were located in Landmark Hall.  ATV has another sales office in Houston, Texas, and a construction facility in Lucedale, Mississippi.

Landmark Hall

On December 30, 1988, Mr. Cutts purchased Landmark Hall. The Landmark Hall main house (the main house) is approximately 140 years old and has three floors, with 10,500 square feet of usable space divided approximately equally among them.  Landmark Hall also has a front yard, parking areas beside and behind the main house, an 800-square-foot swimming pool (the pool) with a

privacy fence, and a 1,400-square-foot carriage house (the carriage house) in back of the main house.

On January 2, 1994, Mr. Cutts and ATV entered into a 5-year written lease (the lease) under which ATV leased 95 percent of the building space, land, and surrounding parking areas of Landmark Hall at a rental of $6,500 per month for use as an office building by ATV.

Under the lease terms, Mr. Cutts was not required to repair the pool or furnish any utilities, and ATV was required to insure all buildings, improvements, and equipment for not less than 80 percent of the full fair insurable restoration value, with the insurance to be held in Mr. Cutts's name.

When Mr. Cutts purchased Landmark Hall, the carriage house was not usable because it had been damaged by Hurricane Frederick. ATV spent at least $60,000 to renovate Landmark Hall, including painting the main house, installing central heating and air conditioning, and rebuilding the carriage house. In 1995, ATV began to use the carriage house as an accounting office. The renovation restored the main house to its status as a beautiful mid-19th century mansion, which has impressed ATV's customers. Although the record does not disclose whether Landmark Hall is on the National Register of Historic Places, an easement in favor of a local land commission prohibits changes to the facade of the main house.

During the 1997 year, ATV conducted its Mobile, Alabama, office business activities in the main house and accounting activities in the carriage house. It employed 23 or 24 people in Mobile. During 1997, Mr. Cutts resided in the main house and had a reserved parking space in back of the main house.

Mr. Cutts's minor son, Justin Cutts (Justin), was 7 or 8 years old in 1997. Under Mr. Cutts's custody agreement with his former wife, Justin visited Mr. Cutts every other weekend and for 1 month each summer. Mr. Cutts supervised Justin during these visits. Occasionally, Justin had friends over for visits at Landmark Hall.

Mr. Cutts resides on the third floor of the main house, as did Justin during his visits. There are 10 rooms on the third floor of the main house, including a den at the back, four bedrooms, three bathrooms, a tax office, and a storage room. Mr. Cutts used the den and one bedroom for himself, and another bedroom for Justin. They used the bathroom next to Mr. Cutts's room, and Justin also occasionally used the bathroom next to the den. To enter the den, Mr. Cutts must walk through the bedroom between the den and Justin's bedroom. The bedroom next to the tax office was used as a company bedroom for ATV employees. Mr. Cutts and Justin entered the third floor using a back entrance near Mr. Cutts's parking space that is separate from the front entrance used by other ATV employees.

Mr. Cutts conducted personal business activities and maintained related records in his ATV office, which is on the first floor of the main house.

The first and second floors of the main house contained offices for ATV employees. The second floor also contained a dining room and kitchen used by ATV for conferences, meetings, and lunches. Mr. Cutts occasionally used the kitchen for limited activities, such as eating a bowl of cereal; Mr. Cutts eats out for lunch and dinner except when the kitchen and dining room are used for ATV's lunch and dinner meetings.

According to Mr. Cutts's measurements, the total square footage of the den, Mr. Cutts's bedroom, Justin's bedroom, and the bathroom used by them is 860 square feet. There is no evidence in the record of a floor plan of the main house or the square footage of the individual rooms and hallways in the main house. There is no evidence in the record of the time spent by Mr. Cutts for personal use and ATV for business use of different areas of the main house.

ATV paid all Landmark Hall utility expenses. Mr. Cutts paid real estate taxes and insurance premiums with respect to Landmark Hall. Mr. Cutts paid the Landmark Hall mortgage by having ATV write the mortgage payment check, which Mr. Cutts then credited against ATV's rent obligation.

On its 1997 return, ATV deducted $78,000 for rent paid for the use of Landmark Hall at the rate of $6,500 per month and claimed expenses of $11,919.19 for all utility expenses and $6,095 for repairs to the pool.

On Schedule E, Supplemental Income and Loss, of his 1997 return, Mr. Cutts reported $78,000 in rental income from Landmark Hall and claimed Landmark Hall deductions totaling $18,100 for the following items: $6,131 mortgage interest, $3,137 real estate taxes, $6,668 depreciation allowance, and $2,164 insurance. Respondent determined ATV's business use of Landmark Hall as 67 percent and Mr. Cutts's personal use as 33 percent. In so doing, respondent determined ATV could deduct $52,260 of the $78,000 rent expense on Landmark Hall (.67 x 78,000), thereby disallowing $25,740 of the rent expense ATV claimed as a deduction.

Swimming Pool

All ATV employees working at Landmark Hall were aware they could use the pool for 1 hour each day as a fringe benefit. Cheryl Harrington (Ms. Harrington), secretary of ATV, who has been employed by ATV since 1984, used the pool several times a week during the summer of 1997. Justin used the pool during his summer visits. In 1997, ATV claimed a deduction of $6,095 for the cost of repairing leaks in the pool.

Below-Market Loans

During petitioners' 1997 tax year, ATV and Mr. Cutts had open-account indebtedness to each other. No interest was paid or accrued on amounts due ATV from Mr. Cutts or on amounts due Mr. Cutts from ATV. During preparation for trial, ATV and respondent prepared separate general ledgers (the ledgers) to show the respective amounts of debt between ATV and Mr. Cutts and the amount or amounts of imputed interest under section 7872.[3]

For petitioners' 1997 tax year, the ledgers included a "receivable from shareholder" account for amounts due ATV from Mr. Cutts and a "payable to shareholder" account for amounts due Mr. Cutts from ATV. At all relevant times, Mr. Cutts's debt to ATV exceeded ATV's debt to Mr. Cutts. On his 1997 return, Mr. Cutts did not deduct from his $78,000 Landmark Hall rent income any of the debt that he owed ATV or that ATV owed him.

In ATV's ledger, at the end of each month of 1997, the respective debts between ATV and Mr. Cutts are netted out, and interest at the applicable Federal rate (APR) is applied to the balance. In respondent's ledger, the column of debt from Mr. Cutts to ATV is maintained separately from the column of debt from ATV to Mr. Cutts, and interest at the APR is computed on the separate monthly balances.

---

[3]There are small discrepancies in the debt amounts recorded in ATV's and respondent's ledgers; those discrepancies should be reconciled by the parties in the Rule 155 computation.

The amounts owed by Mr. Cutts to ATV represent personal items purchased by Mr. Cutts with ATV's credit card and child support payments made on his behalf by ATV.  The amounts owed by ATV to Mr. Cutts represent ATV's monthly Landmark Hall rental obligations, reduced by Landmark Hall mortgage payments made on Mr. Cutts's behalf by ATV.  The total amount due Mr. Cutts from ATV increased by $3,611 each month, apparently representing the excess of ATV's rental obligations over the required payments on the Landmark Hall mortgage; the total amount due ATV from Mr. Cutts increased and decreased by different amounts each month.

As of September 30, 1997, there are entries in the ledgers showing $199,089.05 of the amount due Mr. Cutts from ATV as credited against the amount due ATV from Mr. Cutts.  For the entire period October 1, 1996 - December 31, 1997--the 1997 tax year--there are no entries in the ledgers making any other credit transfers between the two accounts.

Discussion

Issue 1.  ATV's Right to Landmark Hall Expense Deductions and Mr. Cutts's Exposure to Constructive Dividends From ATV

Petitioners argue that even if Mr. Cutts were allocated more than 5 percent personal use of Landmark Hall, Mr. Cutts would not have rent or dividend income to the extent the $78,000 annual rent paid by ATV for the use of 95 percent of Landmark Hall was less than fair market rent.  There is no evidence in the record of what the fair market value or fair market rent of Landmark

Hall would have been during petitioners' 1997 tax year other than unsupported assertions that the rent payable under the lease was less than fair market rent.

The allocation in the lease under which ATV purported to lease 95 percent of the Landmark Hall property from Mr. Cutts for its business use was in accordance, petitioners asserted, with an allocation that had been arrived at and approved in the audits of prior years' returns by the Internal Revenue Service (IRS).

We decide this issue on the facts in the record regarding use of Landmark Hall during the 1997 tax year at issue. Although respondent's revenue agents, in prior year audits, may have allocated Mr. Cutts a lesser percentage of Landmark Hall for personal use than respondent determined for the 1997 tax year, we do not find the prior year audits relevant or persuasive to show how Landmark Hall was actually used during the 1997 tax year. We disregard the results of the prior year audits in their entirety. We assume the allocation of ATV's $78,000 rent payments between rent and dividends has no tax consequence to Mr. Cutts for his 1997 tax year.

There is an ambiguity or oversight in the statutory notice that we did not discover until after the briefing schedule had been completed. If, as the lease provides, the $78,000 annual rent was paid for the use of 95 percent of Landmark Hall, then ATV and Mr. Cutts necessarily assumed and agreed the rental value

of the property was $82,105.26 per year ($78,000 ÷ .95). Respondent allowed ATV to deduct only $52,260 of ATV's $78,000 Landmark Hall rent expense (.67 x 78,000), thereby disallowing $25,740 of the rent expense. In so doing, respondent failed to account for the 5 percent of Landmark Hall allocated to Mr. Cutts's personal use under the terms of the lease.

If we had upheld respondent's determination of 33 percent personal use by Mr. Cutts, ATV would have been entitled to a rent deduction of $55,010.52 ($82,105.26 x .67) and the disallowed rent deduction would have been $22,989.48 ($78,000 - $55,010.52).

We direct the parties to account for the 5 percent of Landmark Hall not leased and used by ATV, which has a rental value of $4,105.26 ($82,105.26 - $78,000) under the terms of the lease, in the Rule 155 computation in accordance with our holding on Issue 1 in this case, as discussed below.

Petitioners argue Mr. Cutts should be allocated 7.2 percent of Landmark Hall for personal use of four rooms on the third floor, including Justin's personal bedroom, the den, his own bedroom, and one bathroom, that, according to Mr. Cutts's measurements, occupy 860 square feet out of 11,900 square feet for the main house and carriage house. Respondent argues Mr. Cutts should be allocated a minimum of 33 percent of Landmark Hall for his overall personal use of the whole third floor and the kitchen. Respondent does not include the carriage house as

part of the allocation because it was not available for use at the time of execution of the lease. The parties disagree whether to allocate the pool to Mr. Cutts for personal use so that ATV's payment of the pool repair expense is a dividend to Mr. Cutts.

Petitioners bear the burden of proving their entitlement to business expense deductions. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 7491(a) does not shift the burden of proof to the Commissioner. Petitioners have neither alleged section 7491 applies nor established their compliance with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, maintain required records, and cooperate fully with the Commissioner's reasonable requests. See sec. 7491(a)(2); see also Weaver v. Commissioner, 121 T.C. 273 (2003).

To determine petitioners' income and allowable deductions for use of Landmark Hall, we first allocate the use of Landmark Hall between ATV's business use and Mr. Cutts's personal use.

Where a facility serves both business and personal purposes, an allocation must be made by comparing the space and/or time devoted to business use with total use. Intl. Artists, Ltd. v. Commissioner, 55 T.C. 94 (1970); Eden v. Commissioner, T.C. Memo. 1987-101. The primary purpose criterion, governing the deductibility of expenditures related to both business and personal purposes, applies only to cases in which the secondary purpose is merely incidental and relatively insignificant. Intl.

Artists, Ltd. v. Commissioner, supra at 105; Heuer v. Commissioner, 32 T.C. 947 (1959), affd. 283 F.2d 865 (5th Cir. 1960). Where only less precise measurements can be made, the allocation is made on the basis of an evaluation of the total circumstances. Intl. Artists, Ltd. v. Commissioner, supra.

We include the carriage house in our allocation because, during petitioners' 1997 tax year, ATV used the carriage house as office space for its employees. We also include the 800-square foot pool as part of our allocation. The carriage house, main house, and pool occupy 12,700 square feet.

All ATV employees working at Landmark Hall were aware they were permitted to use the pool 1 hour each day, and Ms. Harrington did in fact use the pool several times per week in 1997. Any use by Justin during his 1-month stay each summer and his weekend visits was incidental and not substantial compared to allowable use by ATV employees. We allocate the pool to ATV for use as an entertainment facility. See sec. 274(a)(1)(B); sec. 1.274-2(b)(1), Income Tax Regs.

Mr. Cutts conceded Justin occasionally used another bathroom on the third floor near the den. Because a 7- or 8-year-old boy would probably use the first bathroom available, and given Justin's extended stay during the summer and weekend visits, it is likely he used this bathroom more than any ATV employees. We

allocate the bathroom on the third floor near the den to Mr. Cutts for his personal use.

We allocate the bedroom between the den and Justin's room to Mr. Cutts for personal use. This bedroom was an integral part of Mr. Cutt's personal space that he and Justin had to walk through to enter the den.

Mr. Cutts lived by himself. He was not married during the 1997 year, and the only child who lived with him--over the summer and on the weekends--was Justin. Mr. Cutts used his own office and den to handle his personal business and entertainment. We see no reason why Mr. Cutts would use a third bathroom or any other rooms on the third floor for his personal use. We allocate the tax office, the storage room, the company bedroom, and the third bathroom on the third floor to ATV for business use.

Unless all ATV employees always ate lunch outside Landmark Hall, it is highly likely ATV employees had access to the kitchen for purposes of storing or making lunches. ATV also likely used the kitchen to prepare food and beverages for meetings. Mr. Cutts ate out for lunch and dinner. His use of the kitchen occasionally to eat a bowl of cereal was incidental and insubstantial. We allocate the kitchen to ATV for business use.

Mr. Cutts's use of his office on the first floor of the main house for personal business and investment work was incidental and insubstantial in relation to Mr. Cutts's predominant use of

the office to fulfill his duties as president of ATV.  We allocate Mr. Cutts's first floor office to ATV for business use.

We also find the entire first floor and second floor including the kitchen and dining room were used by ATV for business use and allocate both floors to ATV.

According to Mr. Cutts's measurements, the four rooms originally claimed by him for his personal use, not including the additional bathroom and bedroom near the den that we allocated to Mr. Cutts, occupy only 860 square feet out of 3,500 square feet on the third floor.  We find it incredible that the other six rooms on the third floor occupy more than 3 times the space of the four rooms originally claimed by Mr. Cutts.  Petitioners' position becomes completely untenable when we take account of the additional two rooms allocated to Mr. Cutts.

Inasmuch as the record evidence lacks a floor plan of the main house or measurements of any of the other rooms on the third floor, we estimate, applying Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), the space Mr. Cutts used on the third floor.  Mr. Cutts used 6 of the 10 rooms on the third floor.  Because two of those rooms were bathrooms that were much smaller than the other rooms, we estimate Mr. Cutts used 47 percent of the third floor, which constitutes roughly 1,645 square feet (.47 x 3,500). Rounding up, we allocate 13 percent of the main house, carriage house, and pool to Mr. Cutts for his personal use (1,645 square

feet ÷ 12,700 total square feet) and the remaining 87 percent to ATV for business use.

Neither party addressed ATV's payment of rent for the use of the parking area and driveway beside and behind the main house. There is no record evidence of the square footage of the parking area and driveway. Unless ATV employees carpooled to work in 1997, it is fair to assume all or almost all of the employees drove their own cars to work, requiring at least 20 parking spaces plus the reserved spot for Mr. Cutts. Under section 132(f)(2)(B), the dollar limit for qualified parking was $165 in 1996 and $170 in 1997. See Rev. Proc. 95-53, sec. 3.06, 1995-2 C.B. 445, 448; Rev. Proc. 96-59, sec. 3.07, 1996-2 C.B. 392, 395.

In absence of record evidence of the going monthly rate during 1997 for outdoor parking spaces or for an outdoor parking lot for 21 cars in Mobile, Alabama, we estimate, bearing heavily against petitioners, whose inexactitude is of their own making, the fair market rent for the parking area and driveway at Landmark Hall. See Cohan v. Commissioner, supra. Using the qualified parking limits under section 132(f)(2)(B), and taking account of the lower cost of living in Mobile, Alabama,[4] and the likelihood that the rent a landowner would charge a parking lot

[4]For the fourth quarter of 1997, Mobile, Ala., had a cost-of-living index of 93.6, which is 6.4 points below the national average of 100. See Low Cost Living in Mobile, The View--A Monthly Business Publication for the Members of the Mobile Area Chamber of Commerce, Vol. XXX, No. 5 at 2 (May 1998).

operator would be no more than 50 percent of the aggregate retail rental value of the individual parking spaces, we estimate the fair market rent of the parking area and driveway was $1,075 per month, including $75 for Mr. Cutts's reserved space, for a total of $12,900 for ATV's 1997 tax year ($1,075 x 12).

The parking area constitutes 15.7 percent of Landmark Hall ($12,900 ÷ $82,105.26), 1 percent of which is allocated to Mr. Cutts for personal parking ($75 x 12 ÷ $82,105.26), and 14.7 percent to ATV for business parking.

Of the remaining 84.3 percent of Landmark Hall for the main house, carriage house, and pool (100 percent - 15.7 percent), ATV used 87 percent for business use, which constitutes 73.3 percent of Landmark Hall (.87 x .843). Adding ATV's business use of the parking area to its business use of the main house, carriage house, and pool, we find ATV used 88 percent of Landmark Hall. (73.3 percent + 14.7 percent). Mr. Cutts used the remaining 12 percent of Landmark Hall for personal use.

The parties did not address the significance of the picturesque front yard and facade. Because ATV derived the predominant benefit from Landmark Hall, including the front yard and facade, as a beautiful mid-19th century mansion that impressed its customers, we allocate to ATV an additional 1 percent of the property for use of the front yard and facade.

Taking into account all aspects of Landmark Hall, we allocate to ATV and Mr. Cutts 89 percent and 11 percent of Landmark Hall, respectively.

Section 274(a) generally disallows a deduction for entertainment expenses that are not directly related to or associated with the active conduct of a trade or business. Section 274(d) disallows a deduction under section 162 or 212 for entertainment expenses unless the taxpayer substantiates each element of an expenditure or use of property by "adequate records" or by "sufficient evidence corroborating the taxpayer's own statement". Under section 274(a), which applies to the costs of a swimming pool, taxpayers can deduct expenses for recreational, social, or similar activities (including facilities therefor) primarily for the benefit of employees, provided there is no discrimination in favor of officers, shareholders or other owners, or highly compensated employees. Sec. 274(e)(4); sec. 1.274-2(f)(2)(v), Income Tax Regs.

The pool was simply used for employee entertainment and was not directly related to or associated with ATV's trade or business. Even if the pool satisfies the proviso under section 274(e)(4), ATV did not provide any records or documents to substantiate use of the pool by employees other than officers, shareholders or other owners, or highly compensated employees. Ms. Harrington was an officer of ATV, and there is no information

in the record to show she was not a highly compensated employee in 1997. Although we allocate the pool to ATV for entertainment use, we hold ATV is not entitled to deduct the pool repair expenses because of its failure to maintain the proper records.

We hold ATV's payment of 100 percent of the utilities is a constructive dividend to Mr. Cutts to the extent of 11 percent thereof allocable to Mr. Cutts's personal use. If shareholders use corporation-owned property for personal purposes, they will be charged with additional distributions from the corporation, taxable to them as constructive dividend income if the corporation has sufficient earnings and profits. See Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); Melvin v. Commissioner, 88 T.C. 63, 80 (1987), affd. 894 F.2d 1072 (9th Cir. 1990).

We hold ATV is entitled to deduct 89 percent of the Landmark Hall utilities expense as attributable to its business use of the property. The corporation will not be allowed to deduct costs of maintaining property allocable to its shareholders' personal use of such property. See United Aniline Co. v. Commissioner, 316 F.2d 701, 705 (1st Cir. 1963); Melvin v. Commissioner, supra.

The amount of ATV's disallowed pool repair expense is not a constructive dividend to Mr. Cutts because we allocated the pool to ATV for entertainment use for the primary benefit of its employees rather than for the primary benefit of Mr. Cutts or any

of ATV's other shareholders.  See <u>United Aniline Co. v. Commissioner</u>, <u>supra</u>; <u>Melvin v. Commissioner</u>, <u>supra</u>.

We allocate to ATV and Mr. Cutts 89 percent and 11 percent of the whole of Landmark Hall, respectively.  In accordance with our instruction, <u>supra</u> p. 12, the amount of ATV's disallowed rent deduction is not $8,580 ($78,000 x .11) but $4,926.32 ($82,105.26 x .11 - $82,105.26 x .05).  We hold ATV is entitled to deduct $73,073.68 of Landmark Hall rent ($78,000 - $4,926.32).

We hold Mr. Cutts is entitled to deduct Schedule E expenses for 89 percent of insurance,[5] mortgage interest,[6] real estate taxes, and depreciation for Landmark Hall.  A Rule 155 computation is necessary to adjust Mr. Cutts's allowable itemized deductions to take our allocation into account.

<u>Issue 2.  Whether the Cross-Debts Between Petitioners Should Be Netted for Purposes of Applying Section 7872</u>

Respondent and petitioners agree that the debts between ATV and Mr. Cutts should be treated as loans with below-market

---

[5]Although, under the lease terms, ATV was required to purchase insurance for Landmark Hall, respondent conceded in the statutory notice that Mr. Cutts is entitled to deduct Landmark Hall insurance as a rental property expense up to the amount of ATV's allocation of Landmark Hall.

[6]Respondent conceded in the statutory notice that Mr. Cutts is entitled to deduct Landmark Hall mortgage interest as a rental property expense up to the amount of ATV's allocation of Landmark Hall.

interest rates to which section 7872 applies.[7]  Respondent argues

Mr. Cutts's debts to ATV and ATV's debts to Mr. Cutts should be

treated as separate loans for purposes of applying section 7872.

Petitioners argue the debts Mr. Cutts owed ATV should be netted

against the debts ATV owed Mr. Cutts.  We agree with petitioners

and hold they are entitled to net the debts.

Because the netting question is an issue of first impression

under section 7872, we dropped the ball in allowing this case to

retain its designation as a small tax case under section 7463 and

Title XVII of the Court's Rules.  Through our inadvertence and

respondent's failure to object, see H. Conf. Rept. 105-599, at

245 (1998), 1998-3 C.B. 747, 999, we failed to exercise our power

prior to trial to remove the small tax case designation under

Rule 171(c).  Even though our opinion is not precedential and

should not be cited as authority, we provide a thorough analysis.

By virtue of the principle of Commissioner v. Sunnen, 333 U.S.

591 (1948), our decision may affect other tax years of

petitioners.[8]

Section 7872 concerns the income tax consequences of "below-

market" or "interest-free" loans" between a corporation and any

---

[7]Petitioners do not dispute respondent's determination that ATV has imputed interest income under sec. 7872 for interest-free loans to stockholder-vice president Max Angerholzer.

[8]In view of the relatively small amounts of taxes and penalties in issue for the 1997 tax year, we are otherwise at a loss to understand the parties' failure to settle these cases.

of its shareholders.  Sec. 7872(a), (c)(1)(C).  We described the
general effect of section 7872 in KTA-Tator, Inc. v.
Commissioner, 108 T.C. 100, 101-102 (1997), as follows:

> Section 7872 recharacterizes a below-market loan as an
> arm's-length transaction in which the lender made a
> loan to the borrower in exchange for a note requiring
> the payment of interest at a statutory rate.  As a
> result, the parties are treated as if the lender made a
> transfer of funds to the borrower, and the borrower
> used these funds to pay interest to the lender.  The
> transfer to the borrower is treated as a gift,
> dividend, contribution of capital, payment of
> compensation, or other payment depending on the
> substance of the transaction.  The interest payment is
> included in the lender's income and generally may be
> deducted by the borrower.  See H. Conf. Rept. 98-861,
> at 1015 (1984), 1984-3 C.B. (Vol. 2) 1, 269.

The forgone interest on a loan by a corporation to its
shareholder is treated as a distribution to the shareholder and
generally taxed as a dividend.  Id. at 106; secs. 61(a)(7),
301(c)(1); H. Conf. Rept. 98-861, 1013 (1984), 1984-3 C.B. (Vol.
2) 267.  The forgone interest on a loan by a shareholder to a
corporation is treated as a capital contribution.  Sec. 1.7872-
4(d), Proposed Income Tax Regs., 50 Fed. Reg. 33561 (Aug. 20,
1985); see also KTA-Tator, Inc. v. Commissioner, supra at 102
("The transfer to the borrower is treated as a * * * contribution
of capital * * * depending on the substance of the
transaction.").  Under section 1.7872-2(a)(1), Proposed Income
Tax Regs., 50 Fed. Reg. 33557 (Aug. 20, 1985):  "each extension

or [sic] credit or transfer of money by a lender to a borrower is treated as a separate loan."[9]

The subject of netting cross-loans by parties whose loan/debt relationships are covered by section 7872 is not addressed by the statute, the conference report or other legislative history, or by the proposed regulations or their preamble.

We address the question in three steps:  First, we consider the local law governing the cross-loans; second, we consider the subject in light of Federal tax principles; and third, for purposes of completeness, we refer to authorities in other contexts in which netting has been addressed.

Because petitioners were Alabama residents and the loans were made in Alabama, we apply Alabama law to determine whether the overlapping advances should be netted or treated separately under local law.  See United States v. Natl. Bank of Commerce, 472 U.S. 713, 722 (1985); LeFrak v. Commissioner, T.C. Memo. 1993-526.

In Norris v. Commercial Natl. Bank, 163 So. 798, 801 (Ala. 1935), the Supreme Court of Alabama cited Washington v.

---

[9]While proposed regulations do constitute "'a body of informed judgment * * * which courts may draw on for guidance'", KTA-Tator, Inc. v. Commissioner, 108 T.C. 100, 102 (1997) (quoting Bolton v. Commissioner, 694 F.2d 556, 560 n.10 (9th Cir. 1982), affg. 77 T.C. 104 (1981)), we accord them no more weight than a litigation position, id. at 102-103; F.W. Woolworth Co. v. Commissioner, 54 T.C. 1233, 1265-1266 (1970).

Timberlake, 74 Ala. 259, 264 (1883), a case between individuals, for the general proposition that "When parties have cross-demands against each other, the real indebtedness is the excess of one debt over the other."  This rule of setoff is most often applied in the bank/depositor context to hold that the bank is entitled, when its loan to the depositor matures, to apply the amount in the depositor's bank account to the bank's loan to the depositor. In re Patterson, 967 F.2d 505 (11th Cir. 1992) (applying Alabama law); Rainsville Bank v. Willingham, 485 So. 2d 319 (Ala. 1986); Norris v. Commercial Natl. Bank, supra.

For the setoff to be valid, the cross-demands must be mutual; that is, "due from one party to the other in the same right."  In re Patterson, supra at 510; Atkinson v. Fed. Deposit Ins. Corp., 635 F.2d 508, 510-511 (5th Cir. 1981); King v. Porter, 160 So. 101, 104 (Ala. 1935).  Whether the cross-demands are mutual is an issue of Alabama local law, which requires that the cross-demands are mature at the time of setoff and are between parties of like capacity.  In re Patterson, supra.

Mutuality of obligation was present between ATV and Mr. Cutts at all relevant times.  There is no evidence in the record the loans had a definite maturity date or that loans to one party would mature before loans to the other, which suggests the cross-loans were payable in full at any time on demand of either ATV or Mr. Cutts.  See sec. 7872(f)(5); KTA-Tator, Inc. v. Commissioner,

supra at 105.  We conclude under Alabama law that open-account
debts from Mr. Cutts to ATV would be netted against open-account
debts from ATV to Mr. Cutts.[10]

We now turn to the Federal income tax treatment of the debts
under section 7872.  Under section 7872(a)(2), any forgone
interest attributable to periods during any calendar year are to
be treated as transferred (and retransferred) on the last day of
such calendar year.  However, the parties conceded, through their
arguments and the ledgers, that, for purposes of this case,
interest should be imputed and treated as payable at the end of
each month rather than at the end of the calendar year.  In the
interests of judicial economy, we accept the parties' concession
of law.  See Fazi v. Commissioner, 105 T.C. 436, 444 (1995).

In KTA-Tator, Inc. v. Commissioner, supra, we agreed with
the Commissioner and held that each of a series of advances under
a line of credit was a separate loan on which imputed interest
began to accrue under section 7872 on each advance as it was
made.  For authoritative guidance to support our holding, we
turned to the conference report to the Deficit Reduction Act of
1984, Pub. L. 98-369, 98 Stat. 494, which states:  "'any transfer

---

[10]Under Alabama tax law, gross income includes interest or
other income determined in accordance with sec. 7872.  Ala. Code
sec. 40-18-14.3 (2003).  Alabama law does not specifically
address whether cross-loans should be netted for purposes of
applying sec. 7872 or the correlative provision of the Alabama
tax law.

of money that provides the transferor with a right to repayment may be a loan.'" KTA-Tator, Inc. v. Commissioner, 108 T.C. at 103 (quoting H. Conf. Rept. 98-861, supra at 1018, 1984-3 C.B. (Vol. 2) at 272).

KTA-Tator, Inc., is distinguishable from this case and does not address whether overlapping loans should be netted. KTA-Tator, Inc., did not involve overlapping open accounts. Rather, it dealt with a timing issue; i.e., whether a series of advances under a line of credit will be considered one loan or a series of separate loans for purposes of section 7872.

Because neither section 7872 nor the conference report provides authoritative guidance on this issue, and the proposed regulations do not address this issue, we turn to other areas of Federal tax law for authority on the subject of netting open account balances between debtor and creditor.

The incidence of taxation depends upon the substance of the transaction. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); United States v. Ingalls, 399 F.2d 143, 145-146 (5th Cir. 1968), revg. 272 F. Supp. 10 (N.D. Ala. 1967). Resort to substance is not a right reserved for the Commissioner's exclusive benefit--to use or not to use--depending on the amount of the tax to be realized. Estate of Weinert v. Commissioner, 294 F.2d 750, 755 (5th Cir. 1961), revg. 31 T.C. 918 (1959); see also Estate of Durkin v. Commissioner, 99 T.C. 561, 572 (1992).

The taxpayer too has a right to assert the priority of substance --at least in a case where his tax reporting and actions show an honest and consistent respect for the substance of a transaction. Estate of Weinert v. Commissioner, supra at 755. The taxpayer's right to assert the primacy of substance over form is the law of the Fifth Circuit that is binding precedent in the Eleventh Circuit, to which this case would be appealable if it were not a small tax case. See Shepherd v. Commissioner, 283 F.3d 1258, 1262 n.6 (11th Cir. 2002), affg. 115 T.C. 376 (2000).[11] We examine the particular transactions at issue to determine whether the form used by ATV and Mr. Cutts reflects the substance of what was accomplished.

United States v. Ingalls, supra, addressed the setoff question in a pre-section 7872 context. The question in Ingalls was whether the compromise of an employment contract claim was legally effective to defer income over the compromise period. The taxpayer was a shareholder in a family-owned corporation. The taxpayer had borrowed heavily from the corporation prior to entering into a long-term employment contract with the corporation. The shareholders got into a dispute over the validity of the employment contract and the amount of debt the

---

[11] Because any appeal in this case, if it were permissible, would lie to the Court of Appeals for the Eleventh Circuit, we follow the precedent established in that Circuit. See Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

taxpayer owed the corporation.  Negotiations between the opposing factions culminated in a settlement agreement.  In Ingalls, the Court of Appeals for the Fifth Circuit described the agreement as follows:

> Under its terms the company purchased the employment contract for $228,360 payable in equal installments of $22,836 on February 1st of the ten next succeeding years and, in turn, taxpayer agreed to pay off his outstanding indebtedness to the company of $228,360 in equal installments of $22,836 on February 1st of the ten next succeeding years * * * the only security for the new note being taxpayer's promise to pay and the following provision:  "[Taxpayer] * * * further agrees that so long as any part of said indebtedness or any interest thereon remains unpaid, the company may make the payments hereinabove agreed to be paid to him by currently crediting said indebtedness with such payments as they accrue."  [Id. at 145.]

On the basis of this agreement, the Court of Appeals in Ingalls held, reversing the District Court, that in substance the disputed employment contract claim was compromised by a discharge of indebtedness.  The taxpayer was held to be in receipt of income equal to the discharged indebtedness in the year of compromise.

The Court of Appeals in Ingalls recognized that mutual debts do not automatically cancel each other, but equity would effectuate a setoff of mutual debts where "'one debt was contracted on the credit of the other.'" Id. at 145-146 (quoting Simmons v. Williams, 27 Ala. 507, 511-512 (1855)).  The Court of Appeals in Ingalls stated that, under these circumstances--

the formality of pleading the set-off would be the only barrier to cancellation of mutual debts contracted on the credit of each other. The agreement here eliminates even the formality of having to plead the set-off since by contract the parties agree that if the taxpayer fails to pay the company, the company is authorized to effect a private set-off by making the bookkeeping entry mentioned above. The agreement speaks for itself and makes clear that the taxpayer had to perform no additional act for the debt to be discharged. * * * [Id. at 146.]

The Court of Appeals in Ingalls concluded there was no nontax business purpose for the installment aspect of the contract compromise even though the corporation had a nontax purpose in reaching the general settlement.

Ingalls is an example of the taxpayer's use of form to attempt to avoid taxes. We disagree with respondent that petitioners' netting the loans is an attempt to disavow the form of the loan transactions to avoid taxes.[12] The form of petitioners' transactions is not dispositive to the issue in this case.

Although netting the loans may save taxes, there is an important nontax business purposes for petitioners' loan transactions. The two open running accounts were set up to keep track of everyday business transactions and for commonsense efficiency reasons. Mr. Cutts was due rent from ATV. Mr. Cutts

---

[12]Even with our generous briefing schedule, respondent failed to address in his reply brief petitioners' citation of United States v. Ingalls, 399 F.2d 143 (5th Cir. 1968). Because Ingalls is distinguishable from the case at hand, we find that respondent did not concede any argument supported by Ingalls.

made personal purchases using the ATV company credit card.
Instead of exchanging checks, petitioners simply deducted Mr.
Cutts's personal purchases from the rent payment obligation and
had ATV pay Mr. Cutts's other obligations such as child support
and Landmark Hall mortgage payment obligations.  Given
respondent's argument in favor of substance over form in the
proposed regulations, it ill behooves respondent to rely on
substance where it suits him and to rely on formalisms when
respondent does not like the result of giving effect to
substance.

Contrary to respondent's argument, we see no reason why
netting would necessarily increase complexity for business and
tax planners.

Respondent argues netting a term loan against a demand loan
would frustrate and complicate enforcement of section 7872.  We
do not have a term loan overlapping a demand loan because both
sets of loans between petitioners are demand loans.  Even if our
decision in this case had precedential authority, our decision
would not govern the situation where a term and demand loan
overlap.  See In re Patterson, 967 F.2d at 510.

Our holding in favor of netting conforms with results in
other contexts where netting of mutual debts has been addressed
for Federal tax purposes.  A zero net interest rate is applied to
overlapping periods of mutual indebtedness between a taxpayer and

the IRS; i.e., "annual netting" and "global interest netting".
See FNMA v. United States, 56 Fed. Cl. 228 (2002); Rev. Proc. 94-60, 1994-2 C.B. 774.

Petitioners are entitled to net the debts and thereby fix the dividend and interest income respectively realized by Mr. Cutts and ATV under section 7872 in amounts smaller than those determined by respondent.

The result of our decision to net the debts is that, under section 7872, ATV is considered to have made nondeductible dividend distributions to Mr. Cutts during each month of his 1997 calendar year in the amount of the forgone interest on the net outstanding balance of each month's debts. Mr. Cutts is treated as having retransferred the forgone interest to ATV during each month of ATV's tax year ended September 30, 1997, thereby giving ATV interest income for each month of its 1997 tax year.[13]

Mr. Cutts is not entitled to deduct the portion of constructive interest payments allocable to personal purchases for the company credit card and ATV's payment of his child support. See sec. 163(h). Mr. Cutts made payments on the Landmark Hall mortgage by having ATV write the mortgage payment

---

[13]Mr. Cutts is not treated as receiving dividend income for his 1997 tax year from loans made by ATV during the 3 months ended Dec. 31, 1996. ATV is not treated as receiving interest income for its tax year ended Sept. 30, 1997, from its loans made to Mr. Cutts during the 3 months ended Dec. 31, 1997. Those periods are not before us.

checks, which Mr. Cutts then credited against ATV's rent obligation. Mr. Cutts is entitled to deduct the portion of constructive interest payments allocable to ATV's payments on the Landmark Hall mortgage to the extent allowable under section 163, which is to be determined in the Rule 155 computation. Because there are no net amounts of interest due from ATV to Mr. Cutts, we have no occasion to consider correlative questions of interest deductibility by ATV.

### Issue 3. Whether Petitioners Are Liable for the Section 6662 Accuracy-Related Penalty for the 1997 Tax Year

Respondent concedes petitioners are not liable for any penalty with respect to any adjustments relative to the use of Landmark Hall.[14] The issue remains whether petitioners are liable for the section 6662(a) accuracy-related penalty for adjustments relative to unreported interest under section 7872.

Section 6662 imposes a penalty of 20 percent on underpayments of tax attributable to negligence or disregard of the rules or regulations. Petitioners can avoid this penalty if they made a reasonable attempt to comply with the provisions of the Internal Revenue Code, and they were not careless, reckless, or in intentional disregard of rules or regulations. See sec. 6662(c); Accardo v. Commissioner, 942 F.2d 444, 452 (7th Cir.

---

[14]In his brief, respondent conceded the accuracy-related penalty for all "expenses claimed by ATV relative to Landmark Hall", including the pool repair expense.

1991), affg. 94 T.C. 96 (1990); Drum v. Commissioner, T.C. Memo. 1994-433, affd. 61 F.3d 910 (9th Cir. 1995).

The Commissioner has the burden of producing sufficient evidence indicating it is appropriate to impose the section 6662(a) penalty or addition to tax. Sec. 7491(c);[15] Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner meets his burden of production, the taxpayer must come forward with evidence sufficient to persuade a court that the Commissioner's determination is incorrect. Higbee v. Commissioner, supra at 447. The taxpayer also bears the burden of proof with regard to issues of reasonable cause. Id. at 446.

Respondent satisfied his burden of production by introducing petitioners' 1997 returns and ATV's ledger showing that neither petitioner reported income or deductions under section 7872 as a result of the debts even though petitioners concede section 7872 applies to the net amount of the debts.

Petitioners did not explain or justify why they did not net the debts and report income under section 7872 for the 1997 tax

---

[15]Sec. 7491 is effective for court proceedings arising in connection with examinations commencing after July 22, 1998. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726. The notices are dated May 22, 2001. The parties have not informed us whether the examination commenced on or before July 22, 1998, and neither party addressed this issue. Because Mr. Cutts's 1997 return was filed on Oct. 19, 1998, and ATV's 1997 return was filed on June 19, 1998, it is obvious that the examinations of petitioners' returns commenced after July 22, 1998.

year.  There is no evidence petitioners attempted to comply with section 7872.  We find petitioners were negligent in not reporting income from the net debts between Mr. Cutts and ATV as giving rise to loans with below-market rates to which section 7872 applies.

We hold petitioners liable for section 6662 accuracy-related penalties for their 1997 tax year in reduced amounts to be determined in the Rule 155 computation.

To give effect to the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>